# Brien *v.* Williamson.

Contracts for the purchase of slaves introduced into this state as merchandise, or for
sale, since the first day of May, 1833, are void, 1. because the provision of the
constitution of this state in relation to slaves so introduced is *per se* a prohibition
of such a traffic; 2. If the provision of the constitution is not of itself a prohibi-
tion, when taken in connection with the legislation of the state, it so clearly settles
the public policy, as to avoid such contracts on the ground of being against public
policy.

IN ERROR from the circuit court of the county of Warren.

This was an action of assumpsit on a promissory note for
twelve hundred dollars, dated 1st November, 1836, and payable
twelve months after date.

The defendant below, who is also the defendant in error, plead-
ed, 1. That the consideration of said note is the price agreed by
the said defendant to be paid to said plaintiff for a negro man
slave named Elisha, introduced into the state of Mississippi as
merchandise and for sale, after the first day of May, 1833, to
wit: on the first day of November, 1836, &c.

The second plea alleged, that said plaintiff not being at the time
an actual settler in the state of Mississippi, did after the first day
of May, 1833, at the county aforesaid, to wit: on the first day of
November, 1836, at the county aforesaid, introduce into the state
of Mississippi, as merchandise and for sale, a certain negro slave
named Elias, and afterwards, to wit: on the said first day of
November, 1836, at the county aforesaid, did sell said negro man
slave Elias, so introduced, to the said defendant, at and for the
price of twelve hundred dollars, in consideration of which slave,
and the delivery of said negro slave Elias to said defendant by
said plaintiff, the said defendant did then and there make and de-
liver to said plaintiff, said supposed promissory note, in said plain-
tiff's declaration mentioned, for the price of said negro slave
Elias.

Brien *v.* Williamson.

To these pleas the plaintiff demurred specially, and assigned for cause:

"1. That said plaintiff is not barred of a recovery upon the note declared on, because the same was given for the price of the negro man slave Elias, introduced into the state of Mississippi as merchandise and for sale, and sold therein after the first day of May, 1833.

2. That there was not any law prohibiting the sale of slaves introduced into the state of Mississippi, as merchandise and for sale, in force in the state of Mississippi on the first day of November, 1836.

3. That on the first day of November, 1836, notes given for the price of slaves introduced into the state of Mississippi after the first day of May, 1833, have not been declared to be void by any law of the state of Mississippi."

The court overruled the demurrer, and the plaintiff failing to answer over, judgment was given for the defendant. Whereupon the plaintiff presented his writ of error to this court, and assigned for error the judgment of the court below in overruling the demurrer.

BRIEN for plaintiff in error.

J. S. YERGER *contra.*

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The plaintiff in error instituted this suit on a promissory note dated 1st November, 1836, made by defendant, who pleaded that the note was given for a negro which had been introduced into this state as merchandise and for sale since the first of May, 1833, and sold by plaintiff to defendant. The plaintiff demurred, but the demurrer was overruled, and leave given to plead over, which the plaintiff refused to do, and thereupon judgment was rendered for defendant, to reverse which this writ of error was taken.

The pleadings bring directly in question the legality of a contract entered into for negroes imported into this state as merchandise since the adoption of the amended constitution. We had regarded this question as entirely settled, first by the decision in

the case of Green *v.* Robinson, second by the case of Hite and Fitzpatrick *v.* Gledwell, and lastly, by a still later case, in which the question was directly presented as a mere question of law, by a demurrer to a plea. Since these cases were decided the same question has been made before the Supreme Court of the United States, in the case of Groves *v.* Slaughter, reported in 15 Peters, in which a different interpretation is given to our constitution, the contract being there held to be valid, whilst we had held it to be null and void. A decision emanating from a court so justly entitled to our highest respect; one whose decisions are received as authoritative throughout this Union, demands of us that we should review our own decisions, and reconsider the question with the utmost possible scrutiny. This we have endeavored to do, and the result has been to strengthen, if possible, the conviction in the correctness of our former decisions. We regard with great deference the decisions of that exalted tribunal, on questions peculiarly within its province, and in such cases will be always ready to yield to them as authoritative. But state tribunals may justly claim to decide for themselves all questions of state policy, and questions involving the interpretation of state constitutions. Our constitution we are sworn to support, and we cannot therefore yield to any interpretation of it unless we are satisfied of its correctness. Still we may well entertain some distrust as to the correctness of our own opinions, when opposed by the decision of the Supreme Court. Our distrust on this occasion is not a little diminished by the reflection that the members of the court were not unanimous in the case of Groves *v.* Slaughter, and by the additional reflection that amongst the dissenting members there were some who have established for themselves imperishable monuments of judicial fame.

We hold the contract void on either of two grounds. First, that the provision in the constitution of 1832, does *per se* prohibit the introduction of slaves into this state as merchandise or for sale. Second, that even if the provision in the constitution is not of itself a prohibition, still when taken in connexion with the legislation of the state, it so clearly settles the public policy as to avoid this contract as being against that policy.

Brien *v.* Williamson.

First, that the provision in the constitution is *per se* a prohibition. The constitution was adopted in 1832, and that portion of it under which this question arises is in these words: "The introduction of slaves into this state as merchandise or for sale, shall be prohibited from and after the first day of May, eighteen hundred and thirty-three: Provided, that the actual settler or settlers shall not be prohibited from purchasing slaves in any state in this union, and bringing them into this state for their own individual use, until the year eighteen hundred and forty-five."

In support of our first position it is proper that we should inquire in the outset what a constitution is, and how it operates. It is a form of government established by the people, designed for their general welfare as a society and as individuals. In the language of a learned jurist, "it was made by the people, made for the people, and is responsible to the people." It is but the frame or skeleton of a government, containing the general outline, leaving the detail to be filled up in subordination and auxiliary to the essential and fundamental principles thereby established. But it is not on that account the less binding. It is from its very nature and object the supreme law of the land, fixed and unalterable, except by the power that made it. It contains only certain great principles which are to control in all legislation, and extend through the whole body politic. These principles are of themselves laws. Constitutions do not usually profess to insure obedience by prescribing penalties; they merely declare the rule or establish the principle, which being paramount, makes void whatever is repugnant to it. Its mandates or principles bind by a moral power. Every functionary is required to take an oath to support it, by which is meant that he will regard it as the supreme law, and aid in carrying out its great principles. For example, the constitution declares that "the right of trial by jury shall remain inviolate." This then is a fixed principle or feature in the government, and being so, it becomes a paramount law. The constitution has not dealt in detail; it does not say how it shall be preserved ; it does not guard it by providing pains and penalties, but by the mere declaration, it has made it part of the supreme law. So it is with every other provision in the constitution. General principles, thought to be essential to a free government, are declared ; and (emanating from the

Brien *v.* Williamson.

sovereign authority) that mere declaration imparts to them all the force of a supreme law.

Let us then endeavor to ascertain what was designed by the clause above quoted. The power of the convention to enact or declare a prohibition, in reference to any subject over which power had not already been delegated to the federal government, I suppose will not be questioned by any one. A state in the form of an organic law may prescribe its whole system of jurisprudence if it should so desire, but to do so would be tedious and difficult. We may safely assert without the shadow of a doubt, that the convention did intend that the importation of slaves into this state as merchandise, should be prohibited after the 1st of May, 1833, either by force of the constitutional provision, or by legislative enactment, and having so intended and declared it through the constitution, it became as much a fundamental and fixed principle in the government, as any other principle or provision whatever. It became by that mere declaration, *propria vigore* a law, and whether it may be supposed to be defective in not providing all the means necessary to enforce the prohibition makes no difference, provided it can by any means be carried into effect. Even if it was intended only as a mandate to the legislature, its operation was to be on the citizens generally. It was not designed as one of those provisions which expend their whole force in directing and regulating the action of the legislative body, but its design was evidently to protect the people against a supposed evil. A time was fixed at which the evil should be prohibited ; from that time it was a law in full force. The legislature could not defeat it by removing the prohibition, and this shows that it had an existing operative force. Having that existing operative force, it was not liable to be defeated by omission. It was one of those principles which required no legislative aid to give it strength, although some may think that its strength was susceptible of a more efficient application by legislative aid. All fundamental principles, whether inherent or otherwise, in any form of government, constitute a part of the law of that government. When the people prescribe their constitutional form of government, they ordain that every part of that form must have its appropriate effect ; every principle is to be regarded as fundamental and self-executing. A constitution need do nothing

more than declare first principles. A constitution, says Judge Pat-
terson, in the case of Vanhorn *v.* Dorrance, 2 Dallas, 304, is the
form of government, delineated by the mighty hand of the people,
in which certain first principles of fundamental laws are establish-
ed. These first principles he regarded as part of the supreme law,
where he says, " I take it to be a clear position that if a legislative
act oppugns a constitutional principle, the former must give way
and be rejected on the score of repugnance." If a legislative act
must give way, how is a contract to stand. Are the courts of the
country to enforce a contract which oppugns a constitutional prin-
ciple, when they would be compelled to declare a legislative act
having a similar effect, void? Surely we may claim for our con-
stitutional provision the dignity of a principle, even if it is too
vague for a prohibition, and being a principle it must be carried
out ; it cannot be defeated by contract. For all the purposes of a
decision as to the validity of this contract, I would cheerfully ad-
mit the main position taken by the supreme court in the case of
Groves *v.* Slaughter, to wit, that this was a mere mandate to the
legislature to carry out the provision by providing proper penalties,
and still I maintain that the mere mandate was a law which will
avoid the contract, which was made in violation of its spirit. It
was designed that a prohibition should take effect from and after
the 1st of May, 1833, a time anterior to the date of this contract.
The legislature had no discretion in the matter. It could not
disregard the mandate by direct action, or by omitting to act.
Evasion of a constitution is a violation of it, so held in many ad-
judged cases, and so from necessity. To evade by omission is as
culpable as to evade by commission, and courts of justice cannot
uphold an evasion, and when such evasion is attempted, the con-
stitution possesses a self-protecting principle which comes in to
defeat improper action and to supply a want of action, when it has
commanded it. The spirit of a law, as well as its letter, must be
respected in its construction, 6 Cranch, 314 ; Devaris on Statutes,
703–4. The spirit of a constitution is entitled to a higher degree
of respect, being the paramount law couched in general terms, and
this respect it must receive from the courts whenever they are
called on to enforce contracts which so palpably conflict with the
constitution. There may be cases in which the command or di-

rection to the legislature is so vague and indefinite as to make it defective as a rule of action, or defective in practical utility; but it is not so with this. It is specific and definite as to what it prohibits, and the time when the prohibition shall commence. Admitting then that as a command to the legislature, it does not amount to a criminal law, still it is sufficient to avoid a contract.

But do the ordinary rules of construction justify the conclusion that this provision was mandatory to the legislature, and nothing more. Words are the signs of our ideas, and when we wish to know legislative intention, we look at the language employed. The natural way to construe a legislative act, is by the language used according to the common acceptation of the words; all other rules are artificial. The same rule applies when we come to construe constitutions. 1 Story's Com. 383. Gibbons *v.* Ogden, 9 Wheaton, 188. In construing the Constitution of the United States, Chief Justice Marshall said, "As men whose intentions require no concealment generally employ the words which most directly and aptly express the idea they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." Mr. Justice Story says, "where the words are plain and clear, and the sense distinct and perfect arising on them, there is generally no necessity to have recourse to other means of interpretation." "It is only," continues the learned author, "where there is some ambiguity or doubt arising from other sources, that interpretation has its proper office." 1 Story's Com. 384. He adds, "that every word employed in the constitution is to be expounded in its plain, obvious and common sense, unless the context furnishes some ground to control, qualify or enlarge it." *Id.* 436. He further says, "It would be dangerous in the extreme to infer from extrinsic circumstances that a case for which the words of an instrument expressly provide, shall be exempted from its operation." *Id.* 411. If there be no difficulty, then, in arriving at the meaning of the convention, by giving to the language employed its natural sense, then there is danger in resorting to extrinsic aid to qualify or enlarge their meaning. The framers of the constitution have declared that, "the introduction of slaves into this state as mer-

chandise or for sale shall be prohibited from and after the first day of May, eighteen hundred and thirty-three." This is the language employed by the highest power in the state; by a body of men selected for their wisdom and assembled to form a supreme law, clothed with full power to enact or declare law. Keeping these considerations in view and looking at this provision by itself, one would naturally conclude that it was thereby intended to declare a prohibition. The import of this language is, that a prohibition should take effect on the 1st of May, 1833. We plainly see what was desired, and the language is appropriate for the accomplishment of that desire. The words " shall be," when used by a law-making power, are words of enactment; they declare the law. In legislative acts this undoubtedly would be their proper meaning; when used in a constitution they have the same meaning unless they be qualified by other words indicating the scope of their meaning. It is not said that the legislature shall prohibit, and in order to make it have that meaning, a supposed defect must be supplied by extraneous aid. By this extraneous aid the sentence is converted into a mere direction to the legislature to make a law, instead of operating itself as a law. The words " shall be" are not peculiar to our constitution, but they have been used in others, and have received a judicial interpretation. The Constitution of the United States declares that " the judicial power of the United States shall be vested in one supreme court, and such other inferior courts as the congress may from time to time ordain and establish." In the case of Martin *v.* Hunter's lessee, 1 Wheat. 304, these words were held to be a mandate which congress could not disobey; and from that which follows in the decision I am induced to conclude, that it was considered as a mandate merely because all the courts were not established by the constitution. The subsequent declaration " that the judicial power shall extend to all cases in law and equity arising under this constitution," &c. was held to confer the jurisdiction without further legislation. So in reference to the declarations in the same instrument, "the supreme court shall have original jurisdiction," &c.; "the judges both of the supreme and inferior courts shall hold their offices," &c. "the executive power shall be vested in a President of the United States of America." In all these cases the language used

was considered as doing the thing which it declared should be done.   In reference to the executive power, the court say, "could Congress vest it in any other person, or is it to await their good pleasure whether it shall vest at all?"   That instrument also declares that "all legislative power herein granted shall be vested in a Congress of the United States."   "Will it," said the court, "be contended that the legislative power is not absolutely vested? that the words merely refer to some future act, and mean only that the legislative power may hereafter be vested?   We might make the same inquiry, and ask if the words, "shall be prohibited," mean only may be prohibited.   This authority is directly in point, and it is referred to for the purpose of showing what has been considered the natural meaning of the very same words when used in a similar instrument.

Let us suppose that the convention did intend to enact a prohibition against the traffic in slaves, to take effect at a future day, could they have expressed such an intention in words more appropriate?   I can think of none.   The language used conveys that idea; then how can it be justly said that a different thing was meant?   We are to suppose the members of the convention meant what they have said, and we should not impute to them a different meaning by construction, when none is needed.   Construction is resorted to for the purpose of carrying out legislative intention; but there is no use in resorting to it at all where it can be of no service.   This provision can be fully carried out as it stands, without any aid whatever.   In every other instance where a particular direction was addressed to the legislature, it has been done in express terms.   Thus, the "legislature shall provide by law for organizing and disciplining the militia;" "the legislature shall provide by law for determining contested elections," &c.; "the legislature shall pass laws to suppress the evil practice of duelling."   Several other instances might be cited, and it is singular that this provision should be considered as only mandatory when it is the only instance in the constitution of a command given particularly to the legislature without naming that body; and on the other hand, it is the only instance in which the words shall be are not used as words of enactment; as words declaratory of the law.   These words are used on every occasion when it was in-

Brien *v.* Williamson.

tended to place any thing beyond legislative control. The bill of rights declares, "the right of religious worship, without discrimination shall forever be free;" "all courts shall be open," &c.; "all persons shall, before conviction, be bailable;" "the powers of the government of the state of Mississippi shall be divided into three distinct departments." In these and many other instances the words shall be are equivalent to "be it enacted," "it is enacted," or "it is declared." They do not mean that there is something to be performed by the legislature. We are aware that the same words used in the same instrument are not always to be construed alike, but when words occur so repeatedly in the same instrument, and are used so invariably to perform the same office, it would seem to furnish a reason for requiring clear and unequivocal evidence to justify a change of their sense in a single instance. This would seem to be peculiarly so, when by giving them a different meaning in the one instance the object of the convention may be defeated, but by giving to them the same uniform meaning throughout, the intention is accomplished. Does it not appear singular that these words should have been used in almost every clause of the constitution, and invariably with the same meaning except in the one instance? And does it not seem equally singular that their meaning in that one instance is changed by supplying a supposed ellipsis, which in every other instance was filled by the convention, when it wished to convey the same meaning which the Supreme Court has given the language in this instance. We do not, from the context of the instrument perceive any thing which shows that the words were intended to be used in a different sense, and we conceive that extrinsic aid is unnecessary, and of course inadmissible; that it is uncertain and unsatisfactory even if it could be admitted. The words used have a natural and common meaning when used by a convention, as is shown by their frequent use in all constitutions. That common meaning establishes in this instance a prohibition, and it seems to be proper that we should adhere to that meaning.

Another rule laid down for the construction of laws is, that where they will bear it they must be so construed as to suppress the mischief and advance the remedy. 1 Black. Com. 87. To carry out the intention of the law making power is one of the

principal objects of construction; a construction, therefore, which defeats that intention should never be resorted to when a different one can be sustained. 1 Story's Com. 411. If the provision under consideration was a mere mandate, the history of our legislation shows that it was disregarded. The convention was not insensible to such a result, hence it is reasonable to conclude that something more than a mandate was intended. Why would the convention have given a command that a certain thing should go into effect on a certain day, when it must have been foreseen that their command might be disobeyed. Having equal or indeed higher power, it is a fair presumption that a positive provision was intended rather than a mandate. It is certain that the convention did intend that, by some means or other, a prohibition should take effect on the first day of May, 1833. The language used is of itself sufficient to amount to a prohibition. This is undeniably true, but the whole question is made to turn upon the intention, not upon the legal sufficiency of the words. Then if the intention be apparent, and the words competent to the purpose, I ask if it is fair to give such construction as to defeat the intention, and render the words nugatory? Is it fair by construction to abolish a law which, without such construction, carries out the intention of the law making power? And yet this is the consequence of the decision of the Supreme Court of the United States. We may surely ask that our constitution should be as favorably construed as an ordinary act of the legislature, which could not be thus defeated, if the act contained enough to enable the court to carry it out. The common import of the words will constitute them a prohibition; extraneous aid will supply a supposed defect and convert them into a mere mandate to the legislature. The common meaning, which would carry out the evident intention, is rejected; the artificial or extraneous aid is resorted to, and the evident intention, the apparent and palpable object is defeated, because the provision was supposed to be incomplete, in not having provided proper penalties. Admitting that it was somewhat defective in detail, this is no objection; a constitution is to be construed as a frame of government, or fundamental law. 1 Story's Com. 393. It is not the business of a convention to deal in detail in all things. From such a body general provisions become

fundamental laws. If constitutions were to be construed in all things as mere statutes, many of them would present great ambiguity. But as mere frames these general provisions are to have all the force that can be given them to accomplish the object.

The lights which are furnished by the previous legislation of the state, so far as they can be considered as safe guides, indicate the purpose which we contend for. The territorial legislature, in 1808, passed an act on the subject of the importation of slaves, restrictive in its character. The constitution adopted in 1817, on the admission of the state into the union, declares, "that they (the legislature) shall have full power to prevent slaves from being brought into this state as merchandise." The state was then but thinly settled, and the soil and climate being suited to the cultivation of a staple of extensive use, which cannot be extensively cultivated without slave labor, it was easily foreseen that this description of population would multiply to an extent that might be hazardous. For the purpose of stopping the importation at the proper point, the legislature was clothed with this authority, leaving its exercise discretionary with that body. Then follows the act of 1822, which is also restrictive in its character. Between this period and 1832 the subject was frequently agitated, and, with a view to its final settlement, the provision which has been so often referred to was incorporated into the new constitution. Why should the same people, or a portion of the same, make a provision different from that in the first constitution, in a convention called to amend it, who must have had it before them, and weighed and considered all its provisions, unless they meant to do more than leave it to the legislature. The one provision is but an amendment of the other. Surely the convention would not so have amended as to leave the amendment more uncertain than the original. They could not well have overlooked the fact that the original was addressed to the legislature, and if no alteration was intended in this particular, except to substitute a positive command for a discretionary power, we cannot well account for the omission. If it was intended to make a body act, to which by name the power of discretion had been given, it is unaccountable that the mandate should not have been equally specific in the name of the body to which it was addressed. This change looks like design, and

3*

Brien *v.* Williamson.

raises a presumption that the convention intended to exercise a power which it supposed had been improperly neglected. A distant day was fixed at which the prohibition was to go into effect, that it might not take any one by surprise., That those engaged in that traffic might have timely warning.

Having questioned the correctness of the decision of the supreme court, it is deemed proper that we should give the decision a more minute examination. The court uses this language in showing that there was no prohibition. "But there is nothing in this provision which looks like withdrawing the whole subject from the legislature. On the contrary there is every reason to believe, from the mere naked prohibition, that it looked to legislative enactments to carry it into full operation. And indeed this is indispensable. There are no penalties or sanctions provided in the constitution for its due and effectual operation." The court again says : " Admitting it would be a misdemeanor punishable by fine, this would be entirely inadequate to the full execution of the object intended to be accomplished." The want of proper guards or penalties, seems to be the leading reason which operated on the mind of the court, in arriving at the conclusion, that nothing but a mandate was intended. This reasoning we deem unsatisfactory. With all deference, it assumes too much. The court had no right to assume that it was intended to prohibit the introduction of slaves by provisions or laws more rigid than the one before us. When a penalty or punishment is prescribed by the legislature, it is not for the court to say that more rigid punishment was intended, because that which is prescribed may be thought unsufficient to insure obedience. When a statute prohibits merely, without annexing penalties, the common law punishes for a violation, and as the common law is part of the law of the land, it is fair in such cases to infer that the legislature intended to leave the punishment to the common law. We insist then that other penalties were not "indispensable," and that punishment by fine would not " be entirely inadequate to the full execution of the object intended to be accomplished ;" on the contrary we think the object could be accomplished by fine. To those who are eager for gain, there is great terror in fines. We might with equal propriety, say that a statute which contains no penalty, was intended only as a mandate to subsequent

Brien *v.* Williamson.

legislatures. We maintain that the convention said enough to accomplish the end. They prohibited and left the punishment to the court. It is the substantive prohibition in a law which makes the offence, 1 Burrow, 545. We might with great propriety go further, and say that the law was quite as good, perhaps it was better, as it came from the hands of the convention, than it is now or is likely to be made. The strength of a penal statute, consists in the certainty of an adequate punishment, and the chances of punishment are increased in proportion to the simplicity of the law. Complexity always weakens a criminal law, and complexity is often a consequence of increased legislation. So far then as the intention of the convention is to be gathered from the imperfections in the provision, the court is not sustained, even if such imperfection could be regarded as indicative of the construction contended for.

Another reason given by the supreme court for believing that the convention did not intend itself to establish a prohibition, is that it has received a legislative construction. We must protest against any such construction; the legislature had no right to settle the construction. If we interpret the meaning of the convention by legislative acts, the constitution is worthless. A violation ever so gross, would become the true interpretation. The convention established another department to construe the constitution. But what aid is derived from that source? At the session of 1833, before the prohibition was to take effect, we find the legislature proposing an amendment to the constitution, by which it should be left discretionary with that body whether to prohibit or not. This proposition was rejected by the people, and evinced a determination on their part to hold on to the prohibition. An act was also passed, laying a tax on negroes introduced as merchandise; and in 1837, an act was passed imposing a fine of five hundred dollars for each slave introduced, and subjecting the offender to imprisonment. So far as the act laying the tax may be supposed to tolerate the introduction as merchandise, it was clearly unconstitutional, even on the supposition that the constitutional provision was but mandatory to the legislature, for it cannot be contended that they could evade the command in any way. Such an act could certainly furnish no guide to the intention of the convention.

Brien *v.* Williamson.

If it was void as a law, it can furnish no aid in constructing the constitution. It would be strange to say that here is an unconstitutional law, which shows what the convention meant. And yet the supreme court placed much stress on this law. This in effect was going a step further than they professed to go, for it was holding even the mandates which they admitted to exist, to be powerless and ineffectual. It was allowing an act to be valid, which defeated the constitutional mandate. It is fairer to indulge the presumption that the legislature did not know the will of the convention, than to suppose that they intended to annul and defeat it. The latter supposition would involve them in turpitude, and is on that account wholly inadmissible. The former places them in a condition which shows the impropriety of taking their action as a guide to the interpretation of the constitution. The supreme court has placed itself in the attitude of sustaining the taxing act of December, 1833, directly in the face of what it calls a mandate of the convention, directed to the legislature at the session of 1832, thus holding that the mandate might be, and really was defeated by the legislature. This is placing it on the ground that it was a mere request to the legislature, with discretionary power, as a mandate would have been imperative. This reasoning does not tally well with what Judge Story has told us in the case of Martin *v.* Hunter's lessee. He held that the mandatory provisions in the constitution of the United States, addressed to congress, were so imperative that they could not be defeated. How is it that a mandatory provision in our constitution should be less obligatory? The principles asserted in these two cases are irreconcilable. The act of 1837, is also adverted to as proof that the legislature thought it necessary to make some provision to carry out the principles of the constitution. The punishment prescribed by this act is just such as would have been authorized by the constitution, and if it proves any thing, it only furnishes an additional reason that the common law punishment was considered ample by the convention. These conflicting notions of the several legislatures however prove nothing, and any construction built upon them must rest upon the weakest of all foundations. Even since the passage of the act of 1837, no one can pretend that any additional prohibitory strength has been engrafted on the constitution.

Brien *v.* Williamson.

We shall in the next place inquire whether this contract was not void, as being in violation of public policy. The provision in the constitution was not designed to operate on mere individual rights ; it had in view the general welfare of the whole community as a body politic. As a declaration of policy, it is not the less obligatory because there were no penalties annexed. Public policy does not look so much to the punishment of individual offenders, as it does to the advancement of the public interest. It must be undeniably true that the convention considered that the public interest required that the introduction of slaves as merchandise should be prohibited, and it is immaterial whether the determination to accomplish the object was placed in the shape of an operative prohibition, or whether it was addressed to the legislature as a command to act on this subject. In either case it established the policy. If the provision was but mandatory, it was still imperative and was not to be disregarded. In a part of the same section, we find that the citizens of the state are limited in their privileges in this respect, after the year 1845. The convention could not have said more plainly that the public safety or the public interest will be endangered by the unlimited importation of slaves. Take in connexion with this declaration the previous history of our legislation, and all doubt must be removed as to our state policy. A feeling of apprehension began to exhibit itself as early as 1808. In the convention of 1817, it was again manifested, and seeing that the time would arrive when a total prohibition would become necessary, the legislature was clothed with absolute prohibiting power. A change in the constitution was not then anticipated, hence this discretionary power was left with the legislature, to be exercised when the public interest should demand it, as it was supposed it would. After this period other laws were passed, authorizing the introduction of slaves only on certain conditions. The vendors were required to produce evidence of the good character of the slaves introduced. These certificates of good character were required to be recorded when the slave was sold. Slaves born out of the United States, and also such as had been convicted of any offence, were not allowed to be brought into the state. When it was thought necessary to amend the constitution in 1832, we find this subject occupying the serious considera-

tion of the convention, and it resulted in the article now under consideration. There is another striking evidence of the public mind on this subject. In 1832, the legislature submitted to the consideration of the people an amendment, proposing to leave this question with the legislature as a discretionary power, just as it stood under the first constitution. The proposition was refused, leaving the prohibition without alteration. If all this does not establish the policy of the state, then we must confess that we are wholly at a loss to know what would. Still the supreme court has said that our policy was unsettled. If a fixed and fundamental provision in our constitution does not settle our policy, it is difficult to imagine how public policy could be settled. Our legislation has looked and tended to this point since 1817. Any law for the general welfare of a state, establishes at once its policy, and the penalties which may be prescribed, have no weight in fixing that policy. The purpose of a law is its policy. We learn from the declaratory part what the law is; the sanction is to force obedience to the rule. We need not cite authorities to show what has been held sufficient to evince public policy. We apprehend that a stronger case could not be found any where. The people in convention may undoubtedly say what the general welfare requires, and such declaration is higher evidence of public policy than judicial determination. It would not be questioned that a train of adjudications settling the policy on this subject, would be evidence of what that policy was. Would such decisions be more conclusive than a declaration in the paramount law. We think not. The mischief intended to be suppressed, cannot be mistaken, and the mischief being declared, it must be the policy to suppress it by all competent means. If the law declaring it be defective as a criminal law, still it will operate on contracts either founded on, or being within the principle of the thing prohibited or the mischief. It is the policy of the law to suppress all public nuisances; no contract will be enforced when the consideration tends to defeat this policy. Whatever may endanger the public peace, and public safety, is contrary to the policy of the law. Ultimate public safety was evidently looked to in framing this provision in the constitution. It was equivalent to a declaration of safety, and whatever may defeat it is illegal. Every declaration in our bill of

rights, is a declaration of public policy. It is the policy of the state, that these great first principles should be strictly observed. This cannot be more powerfully enforced than by reference to the language of that instrument. " That the general, great and essential principles of liberty and free government, may be recognized and established, we declare, &c." Here is the plain prime object of the constitution. Every provision in that instrument must have been deemed essential to the end or object declared, and whether it be a grant, a mandate, or a prohibition, it is the policy of the constitution that it should be observed, and nothing which defeats that policy can be valid. Hence we conclude that the prohibitory provision in the constitution was not only binding and operative as such *per se*, but that it also established the policy of the state, and cannot be defeated either by legislative act or by contract.

That contracts in violation of law, or against public policy, cannot be enforced is a position as well established as as any other in the law, and requires no authority to prove it; if it should, it will be sufficient to refer to the case of Craig *v.* the State of Missouri, 4 Peters, 410, in which the question was fully considered by Chief Justice Marshall. The same question was also settled in the case of Hunt *v.* Knickerbocker, 5 J. Rep. 327. It is also fully considered in 2 Kent's Com. 463-4-5-6, and in Comyn on Contracts, 58.

Judgment affirmed.